# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 17-269V

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

EMMA HENDRICKSON,

             Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

             Respondent.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**TO BE PUBLISHED**

Special Master Katherine E. Oler

Filed: May 7, 2021

Attorneys' Fees and Costs

*Mark Sadaka*, Mark T. Sadaka, LLC, Englewood, NJ, for Petitioner
*Sarah Duncan*, U.S. Department of Justice, Washington, DC, for Respondent

## DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

On February 24, 2017, Jeanne Hendrickson (parent and natural guardian) of now-Petitioner Emma Hendrickson ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program") alleging Petitioner suffered a vaccine-induced small fiber neuropathy which resulted in reflex sympathetic dystrophy/complex regional pain syndrome (CRPS), gastroparesis, constipation,

---

[1] Because this Decision contains a reasoned explanation for the action in this case, I intend to post this Decision on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2012)). **This means the Decision will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

tachycardia, orthostatic hypotension, ganglionopathy, and fatigue that was "caused-in-fact" by the human papillomavirus ("HPV") vaccine she received on August 27, 2014. Pet. at 1, ECF No. 1.

This case was dismissed on March 30, 2020, pursuant to Vaccine Rule 21(b)(1). ECF No. 67. On March 26, 2020, Petitioner file an application for attorneys' fees and costs totaling $60,589.03. *See* Fees App. at 4, ECF No. 70. On July 10, 2020, Respondent filed a response stating "petitioner has failed to establish a reasonable basis for her claim. Therefore, petitioner is not entitled to receive a discretionary attorneys' fees and costs award." Fees Resp. at 1, ECF No. 71. On July 17, 2020, Petitioner filed a reply reiterating her belief that there was reasonable basis to file this claim. Fees Reply at 1, ECF No. 72.

For the reasons discussed below, I hereby **GRANT** Petitioner's application and award a total of $60,589.03 in attorneys' fees and costs.

## I.      Relevant Procedural History

Petitioner's mother filed this Petition on February 24, 2017. Pet., ECF No. 1. Petitioner filed a Statement of Completion on July 26, 2017. ECF No. 15. On October 11, 2017, Respondent filed a Rule 4(c) Report stating that compensation was not appropriate. Resp't's Rep. at 1-2, ECF No. 20.

On February 1, 2018, Petitioner filed an expert report from Dr. Yehuda Shoenfeld. Ex. 28. On July 5, 2018, Respondent filed responsive expert reports from Dr. Carlos Rose and Dr. J. Lindsay Whitton. Exs. A and C.

On August 22, 2019, I instructed the Clerk's Office to amend the case caption as Petitioner was now of age. ECF No. 56.

On November 4, 2019, Petitioner's mother, Jeanne Hendrickson, filed an affidavit. Ex. 90.

On November 25, 2019, I held a status conference with the parties. *See* Minute Entry on 11/25/2019; *see also* Scheduling Order on 11/26/2019, ECF No. 61. During this status conference, Petitioner was directed to find additional records to help address the issue of onset, as it was unclear to me whether Petitioner's pain was aggravated by her injury in gym class or by the vaccination. *See* Scheduling Order on 11/26/2019, ECF No. 61.

Petitioner filed a motion for a decision dismissing her petition on March 26, 2020. ECF No. 66. On March 30, 2020, I issued a Decision dismissing the petition. ECF No. 67.

## II.     Fact Evidence

### A. Relevant Medical History

Petitioner received her first HPV vaccination on July 11, 2013. Ex. 1 at 1; Ex. 3 at 2.

2

On August 27, 2014 Petitioner was seen for a well child visit by Michelle Brei, APRN. Ex. 1 at 16-18. Nurse Brei noted that Petitioner had chronic knee pain but "symptoms have improved with PT." *Id.* at 16. The record also noted "Normal muscle tone. All joints with full range of motion. No deformity or tenderness" regarding Petitioner's extremities. *Id.* at 19. Petitioner received her second HPV vaccination during this visit. *Id.* at 18.

On September 15, 2014, Petitioner visited the emergency department at Yale Health Center complaining of right knee pain and being unable to bend or bear weight on her right knee. Ex. 1 at 19-21. Petitioner stated that she heard a pop in her knee during gym class and has not been able to bend her knee or bear weight on it since. *See id.* Petitioner returned on September 18, 2014 for an x-ray which was negative. *Id.* at 23. Petitioner mentioned she had a history of intermittent pain in her right knee since she was four years old. *See id.* Petitioner returned on September 26, 2014 and was diagnosed with a mild medial collateral ligament sprain/hamstring strain from chronic patellofemoral syndrome. *Id.* at 24-25. She was given a knee brace for treatment and referred to physical therapy. *See id.*

On September 30, 2014, Petitioner returned to the Yale Emergency Department after spending the weekend in New York City; she noted that she was experiencing swelling and discoloration in her knee. Ex. 1 at 26-32.

On October 10, 2014, Petitioner returned for an MRI follow-up, which appeared normal. Ex. 1 at 34-36. Dr. Carter noted "This seems to be, at least in part, an amplified pain syndrome… I do think a multimodal approach to this pain without a clear musculoskeletal etiology will be required." *Id.*

On October 14, 2014, Petitioner was seen by Dr. Cordelia Carter for right knee pain. Ex. 1 at 33. It was noted by Dr. Carter that "Emma has a persistent right knee pain in the setting of the 2 normal MRIs. This seems to be at least in part, an amplified pain syndrome." *Id.*

On November 4, 2014, Petitioner presented to the ER with pain. Ex. 1 at 37-41. The attending physician noted Petitioner was in physical therapy with improved range of motion but no improvement in pain, and "Per mom, most likely diagnosis is complex regional pain syndrome." *Id.*

On December 3, 2014, Petitioner presented to Dr. Neil Schechter at the Boston Children's Hospital Chronic Pain Clinic. Ex. 4 at 43-45. In addition to her knee pain, Petitioner stated she had significant nausea as a result of her pain and was experiencing weight loss as a result. *See id.* Petitioner also relayed to Dr. Schechter that her hair and nails were not growing as expected, and that she had developed some color changes on the left side of her chest. *See id.* Dr. Schechter's impression was "given the reported color and temperature changes, allodynia, and pain in a non-dermatomal distribution, she likely meets criteria for complex regional pain syndrome." *Id.* at 44.

On December 5, 2014, Petitioner was admitted into Yale-New Haven Hospital with a principal diagnosis of complex regional pain syndrome and possible gastroparesis. Ex. 1 at 81-86. Petitioner presented with nausea and post-prandial vomiting, and chest pain similar to her right knee pain. *Id.* at 42. It was noted that Petitioner sustained a non-contact injury to her right knee

and immediately experienced severe right knee pain, as well as autonomic symptoms such as edema, flushing, erythema, and hair and nail changes. *Id.* at 80.

On December 19, 2014, Petitioner presented to Robert Sembler, a physical therapist, who noted she had a "long history of mild right knee pain intermittent from 3 y.o but s/p fall 3 months ago that seem to trigger episode of RSD/CRPS." Ex. 1 at 99.

On January 7, 2015, Petitioner presented to Dr. Naila Makhani, a neurologist, for possible immunotherapy. Ex. 7 at 127-30. Dr. Makhani took a detailed history of Petitioner's symptoms, which included notes that she could not walk without crutches and experienced daily pain. *See id.* She also experienced stabbing or burning pain. Dr. Makhani's impression was Petitioner had RSD (reflex sympathetic dystrophy[3]). *See id.*

Petitioner underwent her first plasma exchange on January 9, 2015. Ex. 7 at 473-79. Petitioner received 87 plasma exchanges between January 9, 2015 and May 25, 2017. Fees Resp. at 11; *see* Ex. 7 at 473-666; Ex. 13 at 109.

On January 12, 2015, Petitioner presented to Dr. Emily Greenstein, a cardiologist, for chest pain and dizziness. Ex. 7 at 137-40. Dr. Greenstein's impression was that Petitioner's syncope was vasovagal in origin and that her dizziness was possibly related to her underlying disease. *See id.*

On January 14, 2015, Petitioner was seen by Dr. Arik Alper, a gastroenterologist, for abdominal pain. Ex. 7 at 147-52. Petitioner was assessed with probable gastroparesis associated with her "underlying disease." *See id.*

On June 15, 2015, Petitioner was undergoing her nineteenth plasmapheresis session when Petitioner's mother recalled that "[Petitioner's] symptoms soon began after receiving her first HPV vaccination in 2013. She ha[d] reviewed case reports of these types of symptoms occurring after administration of this vaccination." Ex. 7 at 583.

On June 16, 2015, Petitioner's mother filed a VAERS report. Ex. 16. She reported that Petitioner experienced fatigue and leg pain after her first and second HPV vaccinations. Ex. 16 at 1. Petitioner's mother noted that "[w]ithin 2 weeks of the [second] vaccine, Emma developed significant right leg pain and fatigue. Within 3 weeks, she was unable to bear any weight on her right leg and was diagnosed with CRPS. She developed dysautonomia (POTS, gastroparesis) within 4 or 5 weeks of the vaccine." *Id.*

On June 25, 2015, Petitioner was seen by Dr. Samuel Nurko, a gastroenterologist, at Boston Children's Hospital to see if she had gastroparesis. Ex. 4 at 11-13. Dr. Nurko noted that, "she has had a longstanding history of abdominal pain and discomfort but really 2 years ago she started having pain more often and last September she became much worse, where she could not really eat and developed severe vomiting." Dr. Nurko also noted that "she can get dizzy when she stands up… and there has been an official diagnosis of postural orthostatic hypotension." *Id.* at 12.

---

[3] Also called complex regional pain syndrome Type 1. *See Dorland's Illustrated Medical Dictionary*. (33 ed. 2019), https://www.dorlandsonline.com/dorland/definition?id=110437 (last visited May 4, 2021).

On July 21, 2016, Petitioner was seen by Dr. Enrique Lopez in the Neuropathic Pain Clinic at the Vincera Institute with a chief complaint of right leg pain. Ex. 8 at 1-6. It was noted Petitioner "began to have [leg] pain around the age of 3…. Her pain was stable (but not gone) until she received an HPV vaccine 3 years ago. This caused her pain to exacerbate and became permanent. She then had a second HPV vaccine which made the pain severe and triggered various dysautonomic symptoms which included symptoms of POTTS [sic] and gastroparesis." *Id.* at 1.

On July 31, 2016, Petitioner was seen by Dr. Constance Weismann, a cardiologist, at Yale-New Haven Hospital for dizziness. Ex. 7 at 349-54. Dr. Weismann noted:

> 1 year ago, 2 weeks after she received her HPV vaccination, she developed symptoms of severe right leg pain, and orthostatic symptoms of dizziness and tachycardia especially when standing up. She had several syncopal episodes. She was found to have several auto-antibodies including anti-alpha 1, beta2 adrenergic receptor antibodies, nicotinic acetylcholine receptor ganglionic autoantibodies and M2 muscarinic receptor antibodies… She was staretd [sic] on plasmapheresis in January which she receives every other week and improves her pain but no [sic] the POTS (postural orthostatic tachycardia syndrome) associated symptoms…. Over the last month her dizziness and tachycardia have worsened…. She has not had syncopal episodes recently because she recognizes presyncopal symptoms and lies down when she gets dizzy.

*Id.* at 351.

Petitioner had numerous medical visits and treatments but no other medical history is relevant for the purposes of this decision.

### B. Affidavit of Jeanne Hendrickson

Jeanne Hendrickson is Petitioner's mother. Ex. 90 at 1. She is a Professor of Laboratory Medicine at Yale School of Medicine and is also a pediatric hematologist and transfusion medicine specialist. *See id.* Ms. Hendrickson's clinical interests include "factors influencing alloimmunization… as well as strategies to minimize the formation and dangers of such antibodies." *Id.* at 1. Ms. Hendrickson provided this affidavit to address Respondent's expert reports. *See id.* at 2.

She contests Dr. Rose's opinion that Petitioner did not have HLA antigens associated with CRPS. Ex. 90 at 2. Ms. Hendrickson also opined that while Petitioner had intermittent right knee pain for many years, she did not have the symptoms or signs that qualify as a CRPS diagnosis until after the second HPV vaccine in the fall of 2014. *Id.* at 2. Additionally, Petitioner had about one medical visit a year until the summer of 2013, "with about 5 visits in the year after HPV vaccine #1… and with more than 50 visits per year after HPV vaccine #2." *Id.*

Ms. Hendrickson also clarified a sentence in Petitioner's case report that she wrote, stating that she meant Petitioner's knee pain was longstanding, and not CRPS, as she was not diagnosed with CRPS until 2014. Ex. 90 at 3.

Ms. Hendrickson also stated that "the point of this vaccine injury lawsuit is not about any financial gain but is instead about seeking an acknowledgement that the vaccine may be associated with adverse outcomes in susceptible individuals." Ex. 90 at 4.

### III.   Petitioner's Expert Opinion Evidence

#### A.  Expert Report of Dr. Yehuda Shoenfeld

Dr. Shoenfeld, an immunologist, filed an expert report in support of Petitioner. *See* Ex. 28. No CV was filed for Dr. Shoenfeld, although Dr. Shoenfeld included his credentials in his expert report.[4] Dr. Shoenfeld's expert report (Ex. 28, hereinafter "Shoenfeld Rep.") provided an overview of CRPS and POTS and then cited medical literature detailing POTS and CRPS diagnoses after HPV vaccination. Shoenfeld Rep. at 26-27. Dr. Shoenfeld also cited to numerous case studies and a list of VAERS reports describing people who suffered a similar reaction to Petitioner after the HPV vaccination. *Id.* at 29-36. Those symptoms include syncope, a POTS diagnosis after vaccination, fatigue, vomiting, leg pain, and various other symptoms similar those experienced by Petitioner.

Regarding theory of causation, Dr. Shoenfeld opined about molecular mimicry and how the HPV vaccine can induce autoimmunity. Shoenfeld Rep. at 37-43. Dr. Shoenfeld also offered his opinion regarding *Althen* prong three. *Id.* at 43-45. Dr. Shoenfeld cited to a study of women who received the HPV vaccine and developed vaccine-related symptoms, such as fatigue, headache, pain, limb shaking, dysautonomia syndrome, motor dysfunction, and abnormal sensations. *Id.* at 44; Ex. 87. Another study found that onset ranged from one day to 43 months. *See* Ex. 87. Dr. Shoenfeld concluded that he believed two weeks after Petitioner's second HPV vaccination, her symptoms of right knee pain "significantly progressed" and other symptoms such as bruising, color changes, sweating, and pain were attributable to CRPS. Shoenfeld Rep. at 45. Dr. Shoenfeld further stated that "the collection of pain signs and symptoms appear to converge toward a diagnosis of [CRPS], that includes clinical features with other syndromes [POTS] and chronic fatigue syndrome (CFS) and that has been associated with [the] HPV vaccine." *Id.* at 45-46. Dr. Shoenfeld also stated,

> Ms. Hendrickson is a previously healthy female subject that developed features of complex regional pain syndrome and postural orthostatic tachycardia syndrome 2 weeks after the first and second dose of Gardasil vaccination.

---

[4] Dr. Shoenfeld founded The Center for Autoimmune Disease at Sheba Medical Center, which is affiliated with the Sackler Faulty of Medicine at Tel-Aviv University. Ex. 28 at 1. He is the Laura Schwarz-Kipp Chair for Research of Autoimmune Diseases at Tel-Aviv University and an Emeritus professor at Tel-Aviv University, teaching medical students and research candidates. *See id.* Dr. Shoenfeld's research focuses on autoimmune and rheumatic diseases and he has published more than 975 peer-reviewed papers. *See id.* at 1-2. Dr. Shoenfeld has also authored and edited 28 books and is on the editorial boards of 32 journals in the field of autoimmunity and rheumatology. *See id.* at 2.

In the absence of any other confounders, the time relationship, the plausible mechanism, the logical sequence, positive antibody studies, and the previously reported cases support the notion that it is more reasonable than not that the diagnosis of complex regional pain syndrome with features of postural orthostatic tachycardia syndrome in Ms. Hendrickson resulted post her vaccination with Gardasil.

*Id.* at 46.

## IV.   Legal Standard

Under the Vaccine Act, an award of reasonable attorneys' fees and costs is presumed where a petition for compensation is granted. Where compensation is denied, or a petition is dismissed, as it was in this case, the special master must determine whether the petition was brought in good faith and whether the claim had a reasonable basis. § 15(e)(1).

### A.   Good Faith

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Hum. Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such a requirement is a "subjective standard that focuses upon whether [P]etitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioner had an honest belief that his claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*, No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

### B.   Reasonable Basis

Unlike the good-faith inquiry, an analysis of reasonable basis requires more than just a petitioner's belief in his claim. *Turner*, 2007 WL 4410030, at *6-7. Instead, the claim must at least be supported by objective evidence -- medical records or medical opinion. *Sharp-Roundtree v. Sec'y of Health & Hum. Servs.*, No. 14-804V, 2015 WL 12600336, at *3 (Fed. Cl. Spec. Mstr. Nov. 3, 2015).

While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. United States,* 116 Fed. Cl. 276, 283 (2014). The Court of Federal Claims affirmed in *Chuisano* that "[a]t the most basic level, a petitioner who submits no evidence would not be found to have reasonable basis…." *Id.* at 286. The Court in *Chuisano* found that a petition which relies on temporal proximity and a petitioner's affidavit is not sufficient to establish reasonable basis. *Id.* at 290. *See also Turpin v. Sec'y Health & Hum. Servs.*, No. 99-564V, 2005 WL 1026714, *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005) (finding no reasonable basis

when petitioner submitted an affidavit and no other records); *Brown v. Sec'y Health & Hum. Servs.*, No. 99-539V, 2005 WL 1026713, *2 (Fed. Cl. Spec. Mstr. Mar. 11, 2005) (finding no reasonable basis when petitioner presented only e-mails between her and her attorney). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham v. Sec'y of Health & Hum. Servs.*, No. 2019-1596, 971 F.3d 1337, 1346 (Fed. Cir. Aug. 19, 2020) (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert); *see also James-Cornelius v. Sec'y of Health & Hum. Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021) (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis.").

Temporal proximity between vaccination and onset of symptoms is a necessary component in establishing causation in non-Table cases, but without more, temporal proximity alone "fails to establish a reasonable basis for a vaccine claim." *Chuisano*, 116 Fed. Cl. at 291.

The Federal Circuit has stated that reasonable basis "is an objective inquiry" and concluded that "counsel may not use [an] impending statute of limitations deadline to establish a reasonable basis for [appellant's] claim." *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017). Further, an impending statute of limitations should not even be one of several factors the special master considers in her reasonable basis analysis. "[T]he Federal Circuit forbade, altogether, the consideration of statutory limitations deadlines—and all conduct of counsel—in determining whether there was a reasonable basis for a claim." *Amankwaa v. Sec'y of Health & Hum. Servs.*, 138 Fed. Cl. 282, 289 (2018). Objective medical evidence, including medical records, can constitute evidence of causation supporting a reasonable basis. *Cottingham*, 971 F.3d at 1346.

"[I]n deciding reasonable basis the [s]pecial [m]aster needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery." *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018). Special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1). Special masters and judges of the Court of Federal Claims have interpreted this provision to mean that petitioners must submit medical records or expert medical opinion in support of causation-in-fact claims. *See Waterman v. Sec'y of Health & Hum. Servs.,* 123 Fed. Cl. 564, 574 (2015) (citing *Dickerson v. Sec'y of Health & Hum. Servs*., 35 Fed. Cl. 593, 599 (1996) (stating that medical opinion evidence is required to support an on-Table theory where medical records fail to establish a Table injury)).

When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. It is appropriate to analyze reasonable basis through a totality of the circumstances test that focuses on objective evidence. *Cottingham,* 971 F.3d at 1344. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa*, 138 Fed. Cl. at 289. This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

V.      **Parties' Arguments**

Respondent maintained that "petitioner has failed to establish a reasonable basis for her claim," but does not challenge whether Petitioner filed in good faith. *See* Fees Resp. at 1. Specifically, Respondent stated that there was no objective evidence supporting elements of Petitioner's claim, as medical records demonstrated Petitioner had a "longstanding history of right knee pain prior to her HPV vaccinations, and that the exacerbation of her knee pain began following an injury during gym class at school." Fee Resp. at 16. Respondent also stated that Petitioner and her mother told her medical providers this sequence of events until June 2015 and filed a VAERS report around that time. *See id*. Respondent further alleged that Petitioner's medical providers did not corroborate Petitioner's claims that her symptoms began or worsened after her HPV vaccinations. *See id*. at 17.

Petitioner argued that there is substantial evidence in the record to establish reasonable basis. In Petitioner's medical records, she describes her knee pain as becoming more severe after her second HPV vaccination. Ex. 8 at 1. Additionally, Petitioner's mother filed a VAERS report and published a peer-reviewed article on her daughter's condition. *See* Exs. 14, 16. While the article did not state there was a causal relationship between the vaccine and Petitioner's condition, the article did not dismiss the possibility and encouraged further study. *See* Fees Reply at 2. Petitioner had positive test results for a number of autoantibodies which indicate she had an autoimmune reaction. Fees App. at 3; Ex. 7 at 387-88. Petitioner also filed an expert report from a qualified expert addressing all three *Althen* prongs. Ex. 28.

Petitioner further stated that a number of CRPS cases have been successfully litigated in the Program, and it is clear in the medical records that Petitioner did not have CRPS prior to the vaccination and that the condition "if it preexisted at all, significantly worsened shortly after vaccination." Fees Reply at 1. Petitioner further stated that medical literature clearly indicates that certain forms of CRPS can be immune mediated. *See id.*

VI.     **Discussion**

A.   **Good Faith**

Petitioners are entitled to a presumption of good faith.  *See Grice*, 36 Fed. Cl. 114 at 121. Respondent has not raised any specific objection to the good faith of the petition. *See generally* Fees Resp. Based on my own review of the case, I find that Petitioner acted in good faith when filing this Petition.

B.   **Reasonable Basis for the Claims in the Petition**

The reasonable basis standard is objective and requires Petitioner to submit evidence in support of the petition.  The petition in this case alleges that Petitioner developed "vaccine-induced small fiber neuropathy which resulted in reflex sympathetic dystrophy/complex regional pain syndrome (CRPS), gastroparesis, constipation, tachycardia, orthostatic hypotension, ganglionopathy, and fatigue that was either "caused-in-fact" by the above-stated vaccination(s) or, in the alternative, significantly aggravated by the above-stated vaccinations." Pet. at 1.

The special master's analysis of reasonable basis should center around "an objective evaluation of the relevant medical information that served as the basis for petitioner's claim." *Frantz v. Sec'y of Health & Hum. Servs.*, No. 13-158V, 2019 WL 6974431 (Fed. Cl. 2019) (denying motion for review).

### 1.   Medical Records and Other Documents that Support Reasonable Basis

On June 16, 2015, Petitioner's mother filed a VAERS report. Ex. 16. She reported that "Within 2 weeks of the vaccine,[5] Emma developed significant right leg pain and fatigue. Within 3 weeks, she was unable to bear any weight on her right leg and was diagnosed with CRPS. She developed dysautonomia (POTS, gastroparesis) within 4 or 5 weeks of the vaccine." Ex. 16 at 1.

On July 31, 2015, Petitioner was seen by Dr. Constance Weismann, a cardiologist, at Yale-New Haven Hospital for dizziness. Ex. 7 at 349-54. Dr. Weismann noted: "1 year ago, 2 weeks after she received her HPV vaccination, she developed symptoms of severe right leg pain, and orthostatic symptoms of dizziness and tachycardia especially when standing up. She had several syncopal episodes." *Id.* at 351.

On July 21, 2016, Petitioner was seen by Dr. Enrique Lopez in the Neuropathic Pain Clinic at the Vincera Institute with a chief complaint of right leg pain. Ex. 8 at 1-6. Dr. Lopez noted Petitioner "began to have [leg] pain around the age of 3…. Her pain was stable (but not gone) until she received an HPV vaccine 3 years ago. This caused her pain to exacerbate and became permanent. She then had a second HPV vaccine which made the pain severe and triggered various dysautonomic symptoms which included symptoms of POTTS [sic] and gastroparesis." *Id.* at 1.

The VAERS report and the two medical records referenced above indicate that Petitioner developed leg pain and symptoms of dysautonomia between two and five weeks after her second HPV vaccine. These medical visits were remote in time when compared with other records filed in this case. The records filed close-in-time to vaccination indicate that Petitioner's knee pain occurred as a result of a fall in gym class. *See, e.g.*, Ex. 1 at 16-18, 19-21, 23. These same records do not mention dysautonomia. Although the timing of these medical visits and the VAERS report may well have reduced the weight I assigned to them were this case to have proceeded to a hearing, these documents still constitute some evidence. While I would likely not have found these records to be more persuasive than the contemporaneous records noted above, that is not the standard I must apply in determining whether a reasonable basis existed to file the petition. The Federal Circuit stated in *Cottingham*, "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham*, 971 F.3d 1337, 1346.  These notations in the medical records constitute some evidence of leg pain and dysautonomia after vaccination. Accordingly, I find the VAERS report, along with the July 31, 2015 and July 21, 2016 medical records, when read in conjunction with the expert report, are sufficient to establish that there was reasonable basis to file the petition.

---

[5] Petitioner's mother referred to both the first and second HPV vaccines in the VAERS report, but this specific language referred to the second HPV vaccine, administered on August 27, 2014. *See* Ex. 16 at 1.

### 2.   Medical Opinion

Dr. Shoenfeld filed an expert report wherein he opined that Petitioner's HPV vaccination caused her to develop CRPS and POTS. *See generally* Ex. 28. His theory as to how the HPV vaccine caused these conditions focused on molecular mimicry. *Id.* at 39. Dr. Shoenfeld opined that Petitioner developed these conditions two weeks after her second HPV vaccine, and further opined that this time course constituted an appropriate temporal interval following vaccination. *Id.* at 46-47.

While I do not find this evidence satisfies Petitioner's burden of establishing causation in fact by preponderant evidence, it does constitute some evidence which enables Petitioner to meet her burden in this matter. The totality of the evidence outlined above, in combination with the reduced standard of proof required for establishing reasonable basis was sufficient to provide Petitioner with a reasonable basis to file this Petition.

### C.  Attorneys' Fees

Petitioner requests a total of $50,610.13 in attorneys' fees. *See* Fees Ex. A at 22, ECF No. 70.

### 1.   Reasonable Hourly Rate

A reasonable hourly rate is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of [P]etitioner's attorney." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349).

*McCulloch* provides the framework for determining the appropriate compensation for attorneys' fees based upon the attorneys' experience.  *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[6]

---

[6] The 2015–2016 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule2015-2016.pdf.
The 2017 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2017.pdf.
The 2018 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202018.pdf.
The 2019 Fee Schedule can be accessed at:
http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202019.pdf.
The hourly rates contained within the schedules are updated from the decision in McCulloch, 2015 WL 5634323.

Petitioner's counsel, Mr. Mark Sadaka requests to be compensated at an hourly rate of $350.00 for 2015, $362.95 for 2016, $376.38 for 2017, $396.00 for 2018, $405.00 for 2019, and $422.00 for 2020. Fees App. at 4. This request is consistent with what I and other special masters have granted Mr. Sadaka previously in the Program. *See, e.g., Brunson on behalf of T.A. v. Sec'y of Health & Hum. Servs.*, No. 17-530V, 2021 WL 851085 (Fed. Cl. Spec. Mstr. Jan. 29, 2021); *Nemmer v. Sec'y of Health & Hum. Servs.*, No. 17-1464V, 2020 WL 1910695 (Fed. Cl. Spec. Mstr. Feb. 20, 2020); *Nelson v. Sec'y of Health & Hum. Servs.*, 15-615V (Fed. Cl. Spec. Mstr. Jan. 22, 2018); *Pasquinelli v. Sec'y of Health & Hum. Servs.*, No. 14-1156V, 2017 WL 6816707 (Fed. Cl. Spec. Mstr. Dec. 13, 2017); *Rolshoven v. Sec'y of Health & Hum. Servs.*, No. 14-439V, 2017 WL 5472577 (Fed. Cl. Spec. Mstr. Oct. 19, 2017); *Ladue v. Sec'y of Health & Hum. Servs.,* No. 12-553V, 2018 WL 6978075 (Fed. Cl. Spec. Mstr. Dec. 14, 2018*).* Petitioner also requests an hourly rate of $135.00 for 2015, $140.00 for 2016, $145.17 for 2017, $150.55 for 2018, $156.00 for 2019, and $163.00 for 2020 for paralegal work performed by Bria Wilson, Keri Congiusti, Melina Fotios, and Michele Curry. Fees App. at 4. These rates are also consistent with the rates previous awarded in the Program. Accordingly, I find the requested rates reasonable and that no adjustment is warranted.

## 2.  Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1522 (Fed. Cir. 1993). In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 728-29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction of attorney and paralegal hours). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g., McCulloch*, 2015 WL 5634323, at *26.

Petitioner's counsel has provided a breakdown of hours billed and costs incurred. Fees Ex. A. I find the hours to be reasonable and grant them in full.

Total attorneys' fees to be awarded: **$50,610.13**

## D.  Reasonable Attorneys' Costs

Petitioner requests a total of $9,978.90 in costs, which includes obtaining medical records, postage costs, the Court's filing fee, and expert report fees. Fees Ex. A at 23-24. I have reviewed the supporting documentation and find this request to be reasonable.  Accordingly, I award costs in full.

## 1.  Petitioner's Expert Costs

Petitioner requests costs for the work performed by Dr. Yehuda Shoenfeld, at a rate of $500.00 per hour, for a total of $8,500.00. *See* Fees Ex. A 23-24; Fees Ex. B at 1-2. I have previously awarded Dr. Shoenfeld's requested hourly rate (as have other special masters) and I see no reason to disturb such a request. *See Phillips v. Sec'y of Health & Hum. Servs.*, No. 16-906V, 2019 WL 3409975 (Fed. Cl. Spec. Mstr. May 16, 2019); *see also Schultz v. Sec'y of Health & Hum. Servs.*, No. 16-539V, 2019 WL 5095634 (Fed. Cl. Spec. Mstr. Aug. 15, 2019) (granting Dr. Schoenfeld's requested hourly rate of $500.00; mot. for reconsideration denied); *Johnson v. Sec'y of Health & Hum. Servs.*, No. 14-254V, 2018 WL 3991262 (Fed. Cl. Spec. Mstr. Jul. 3, 2018); *Garner v. Sec'y of Health & Hum. Servs.*, No. 15-63V, 2017 WL 6888834 (Fed. Cl. Spec. Mstr. Nov. 2, 2017) (granting Petitioner's requested fees and costs in full, including Dr. Schoenfeld's hourly rate of $500.00). I also find the time Dr. Schoenfeld billed to complete his work on this case was reasonable. Accordingly, I award Dr. Schoenfeld's expert costs in full.

2. Miscellaneous Costs

I have reviewed all miscellaneous costs for which compensation is requested as well as the supporting documentation. I note that documentation regarding some mailing costs (totaling $23.23) was not provided. These postage expenditures parallel the United States postage prices throughout the years and do not seem unreasonable. Thus, I award Petitioner's requested costs in full.

Total costs to be awarded: **$9,978.90**

## VII.  Conclusion

Accordingly, in the exercise of the discretion afforded to me in determining the propriety of fee and cost awards, and based on the foregoing, I **GRANT** Petitioner's application, as follows:

A lump sum in the amount of **$60,589.03**, representing reimbursement of Petitioner's attorneys' fees and costs in the form of a check jointly payable to Petitioner and her attorney, Mark Sadaka.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this decision.[7]

**IT IS SO ORDERED.**

<u>s/ Katherine E. Oler</u>
Katherine E. Oler
Special Master

---

[7] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of a notice renouncing the right to seek review.